**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**CHARLES MURPHY,**

               Plaintiff**,**

**v.**                                       **CIVIL ACTION NO.: 5:16-CV-27
(JUDGE STAMP)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

               Defendant.

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On March 7, 2016, Plaintiff Charles Murphy ("Plaintiff"), by counsel Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). Plaintiff Murphy filed an Amended Complaint on April 13, 2016. (ECF No. 5). On May 10, 2016, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On June 8, 2016, and July 5, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (ECF No. 9; ECF No. 11). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. PROCEDURAL HISTORY

On November 19, 2012, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on November 19, 2012. (R. 260). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2016; therefore, Plaintiff must establish disability on or before this date. This claim was initially denied on March 29, 2013 (R. 19) and denied again upon reconsideration on June 26, 2013 (R. 155). On July 15, 2013, Plaintiff filed a written request for a hearing (R. 158), which was held before United States Administrative Law Judge ("ALJ") Terrence Hugar on August 4, 2014 in Morgantown, West Virginia. (R. 44). Plaintiff, represented by counsel Brian Bailey, Esq., appeared and testified, as did Linda Dezack, an impartial vocational expert. (Id.). On October 27, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 120). Plaintiff filed a request for reconsideration dated December 16, 2014. (R. 214).

Subsequently, the Appeals Council issued an Order vacating ALJ Hugar's decision and remanding the case for a second hearing before an ALJ for resolution of the following issues:

1. The record is unclear regarding the nature and severity of the claimant's fibromyalgia.
2. The hearing decision does not consider the treating source opinion by Susan Given, PA-C
3. The hearing decision cites case law from outside jurisdictions including several cases from the Ninth Circuit.

(R. 144). That hearing was held on July 7, 2015, before Administrative Law Judge Karen Kostol in Morgantown, West Virginia. (R. 19). Plaintiff, represented by counsel Brian Bailey, Esq., appeared and testified, as did Linda Dezack, an impartial vocational expert. (Id.). On August 14, 2015, ALJ Kostol issued an unfavorable decision to Plaintiff, finding that he was not disabled

within the meaning of the Social Security Act. (R. 21). On January 8, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.    BACKGROUND

Because the original decision issued by ALJ Hugar was vacated by the Appeals Council by Order dated February 26, 2015 (R. 147), the undersigned will not extensively relate either that hearing transcript or the vacated decision; rather, those are cited only when relevant to the analysis and review of the standing decision of ALJ Kostol. All of the following related information thus refers to the subsequent second hearing and decision issued by ALJ Kostol, unless otherwise specified.

### A.    Personal History

Plaintiff was born on August 25, 1967, and was 45 years old at the time he filed his DIB claim. (R. 260). He completed high school and two years of college, but does not have a college degree (R. 75). Plaintiff's prior work experience included serving as a crane operator in the Army, and most recently as a correctional officer in the Pruntytown Correctional Center. (R. 77). He was married at the time he filed his initial claim and at the time of the administrative hearing, and has no dependent children; he lives with his wife, Bettsy. (R. 74). Plaintiff alleged disability based on Stage 3 chronic renal failure, Post-Traumatic Stress Disorder ("PTSD"), bulging discs in his back, Diabetes and related leg pain, arthritis, and Fibromyalgia. (R. 78-79).

### B.    Medical History

#### 1.    Medical History Pre-Dating Alleged Onset Date of November 19, 2012

##### a.    Mental Status Examination

On January 4, 2011 (R. 565) and January 10, 2012, Plaintiff underwent a mental status examination ("Psych C&P" in VA terminology) at the VA. (R. 550) Plaintiff's Disability Determination Summary from the Department of Veterans Affairs documented Plaintiff's lengthy treatment history for many conditions and issues.[1]

---

[1] A list of "All Problems" in Plaintiff's VA Disability Determination Summary reads as follows (R. 793):

| PROBLEM | LAST MOD | PROVIDER |
|---|---|---|
| Bladder, Neurogenic | 02/28/2013 | ANSARI, IRADJ |
| Primary insomnia (ICD-9-CM 307.42) | 06/26/2012 | RIGGS, JEFFREY K |
| Headache *(ICD-9-CM 784.0) | 12/12/2011 | RIGGS, JEFFREY K |
| Postural Hypotension (ICD-9-CM 458.0) | 06/09/2011 | RIGGS, JEFFREY K |
| Dysthymia | 12/06/2010 | KURAPATI, SUREKH |
| Unspecified Personality Disorder | 12/06/2010 | KURAPATI, SUREKH |
| Phobia, Simple | 08/04/2010 | BOURY, JANIS |
| Posttraumatic Stress Disorder *(ICD-9-CM309.81) | 07/14/2010 | BOURY, JANIS |
| Depression, NOS | 06/21/2010 | BOURY, JANIS |
| Mitral Valve Insufficiency *(ICD-9-CM 424.0) | 01/13/2010 | FINKEL,MITCHELL |
| Palpitations (ICD-9-CM 785.1) | 01/13/2010 | FINKEL,MITCHELL |
| Calcaneal spur (ICD-9-CM 726 .73) | 08/31/2009 | RIGGS, JEFFREY K |
| Morbid Obesity (ICD-9-CM 278 .01) | 08/16/2009 | MARINAKIS, HARRY |
| Tobacco Use Disorder | 01/21/2009 | RIGGS, JEFFREY K |
| DM Type II Dm with Neuropathy | 01/21/2009 | RIGGS, JEFFREY K |
| Anxiety     Disorder NOS | 09/18/2008 | KURAPATI, SUREKH |
| GERD *(ICD-9-CM 530.81) | 09/16/2008 | RIGGS, JEFFREY K |
| DJD *(ICD-9-CM 715.90) | 06/30/2008 | RIGGS, JEFFREY K |
| HTN with Renal Failure | 04/18/2008 | RIGGS, JEFFREY K |
| URI (ICD-9-CM 465.9) | 02/21/2008 | RIGGS, JEFFREY K |
| Back Pain, Low | 01/03/2008 | RIGGS, JEFFREY K |
| Sleep Disturbance, Unspecified | 07/25/2007 | KURAPATI, SUREKH |
| Mood Disorder due to a General Medical Cond. (DSM-IV 293.83/ICD-9-CM 293.83) | 11/08/2006 | KURAPATI, SUREKH |
| DJD Knee (ICD-9-CM 715 .98) | 10/12/2006 | CROMWELL,STEPHEN |
| Anxiety *(ICD-9-CM 300.00/300.09) | 10/12/2006 | CROMWELL,STEPHEN |
| Keratitis, Dendritic (HSV) | 10/19/2005 | PALMER, DALE E |
| Hypermetropia | 01/13/2005 | ABRUZZINO, GINO |
| Astigmatism, NOS | 01/13/2005 | ABRUZZINO, GINO |
| Presbyopia | 01/13/2005 | ABRUZZINO, GINO |
| Tobacco Use Disorder *(ICD-9-CM 305 .1) | 07/28/2004 | DELUCA, KATHLEEN |
| Diabetes Mellitus Type II or unspecified | 07/20/2004 | SCHMITT, ARLENE |
| Other Unspecified Counseling | 07/20/2004 | SCHMITT, ARLENE |
| Fitting and Adjustment of Hearing Aid (ICD-9-CM V53 .2) | 01/16/2004 | MAURER, DOREEN C |
| Sensorineural hearing loss of combined types (ICD-9-CM 389.18) | 01/02/2004 | MAURER, DOREEN C |
| Obesity *(ICD-9-CM 278 .00) | 07/11/2003 | GANAN-ALMOND, AR |
| Mixed Hyperlipidemia | 07/11/2003 | GANAN-ALMOND, AR |
| Hypertriglyceridemia | 07/11/2003 | GANAN-ALMOND, AR |
| Osteoarthrosis involving knee (ICD-9-CM715.98) | 07/11/2003 | GANAN-ALMOND, AR |
| Osteoarthrosis, unspecified | 02/06/2003 | HAQUE, NAVEED U |
| Pain in joint involving lower leg | 01/30/2003 | MAXWELL, CHESNEY |
| Follow-Up examination following surgery, unspec | 09/12/2001 | ROSS, KATHY L |

In October 2012. Plaintiff had blood work, an MRI/CT scan of his renal glad, and a PET scan. (R. 397). He further indicated numerous other tests including "breathing test," cardiac catheterization, EKG, Hearing Test, MRI/CT scan of knee, x-rays of his ankle, knee, hip, and back (R. 408).

### 2. Medical History Post-Dating Alleged Onset Date of November 19, 2012

As of March 12, 2015, the full list of Plaintiff's conditions resulting in a VA determination of 100% Service-Connected Disability, with percentages, included:

| | |
|---|---|
| Chronic Renal Disease | 80% |
| Post-Traumatic Stress Disorder | 50% |
| Fibromyalgia | 40% |
| Knee Prosthesis | 30% |
| Degenerative Arthritis of the Spine | 20% |
| Limited Motion of Ankle | 20% |
| Paralysis of Sciatic Nerve | 20% |
| Limited Flexion of Thigh | 10% |
| Limited Extension of Knee | 10% |
| Eczema | 10% |
| Tinnitus | 10% |
| Impaired hearing | 0% |
| Thigh condition | 0% |
| Deformity of the penis | 0% |

(R. 1495).

### 3. Medical Reports/Opinions

#### a. DIB at Initial Level

On March 12, 2013, Karl Hursey, Ph.D. completed a Psychiatric Review Technique (PRT) pursuant to a review of Plaintiff's DIB application at the initial level. (R. 95). Plaintiff was diagnosed with seven (7) severe impairments (fibromyalgia, PTSD, depression, arthritis,

---

| | | |
|---|---|---|
| Unspecified disorder of skin/subcutaneous tiss. | 06/14/2001 | KAUFMANN, RICHARD |
| Secondary cardiomyopathy | 03/13/2000 | THAGIRISA, ANJAN |
| Painful respiration | 03/13/2000 | THAGIRISA, ANJAN |
| Hypertensive renal disease with renal failure | 03/02/2000 | HOZAYREN, OSSAMA |
| Essential Hypertension | 12/20/1996 | AURIEMMA, NANETT |

diabetes, reconstructive surgery of weight-bearing joint/knee replacement, and obesity) and two (2) non-severe impairments (chronic renal failure and high blood pressure). (R. 99). Plaintiff was considered fully credible with respect to his mental symptoms, and partially credible due to "some inconsistencies in degree of limitations alleged." (R. 101).

Dr. Hursey also completed a Mental Residual Functional Capacity Assessment (MRFC) (R. 104). He found Plaintiff not significantly limited with respect to remembering locations, work-like procedures, and short/simple instructions; moderately limited in his ability to understand and remember detailed instructions, and that Plaintiff could "encode and recall routine, repetitive instructions of at least 2 steps." (R. 104). Plaintiff was not considered to have limitations of sustained concentration and persistence, social interaction, or adaption. Id. It was noted that:

> [Plaintiff] shows some severe mental /emotional impairments that produce mild and moderate functional limitations; however, based on the MER, it appears Clmt retains the mental /emotional capacity to carry out simple, routine tasks within the limitations identified above and within any physical limitations that might be found.

Id.

On March 28, 2012, Saima Noon, M.D., completed a Physical Residual Functional Capacity Assessment (PRFC). (R. 101). Plaintiff's exertional limitations were: occasionally lift/carry 10 pounds; frequency lift/carry 10 pounds; stand, walk, or sit about 6 hours in an 8 hour workday; and unlimited pushing/pulling. (R. 102). Plaintiff's postural limitations were: occasionally climb ramps/stairs, balance, stoop, kneel, crouch, or crawl; never climb ladders/ropes/scaffolds, and "avoid unprotected climbing due to morbid obesity." Id. No manipulative, visual, or communicative limitations were found. Id. Plaintiff's environmental limitations were: avoid concentrated exposure to extreme cold, extreme heat, humidity, vibrations, and hazards; and unlimited exposure to wetness, noise, fumes, odors, dusts, gases,

poor ventilations, etc., and "avoid unprotected heights and hazards due to DJD (degenerative joint disease; referring to Plaintiff's arthritis). (R. 103). Reviewer Noon felt Plaintiff would be limited to light work. (R. 105).

### b. Mental Status Examination

On March 4, 2013, Wilda Posey, M.A., completed a Mental Status Examination of Plaintiff. (R. 494). In forming her opinion, Licensed Psychologist Posey reviewed Plaintiff's medical records, including a health summary from the Veteran's Administration (VA) Center, in which Plaintiff's previous psychologist, Shahnaz Younus, M.D., diagnosed Major Depressive Disorder (recurrent, moderate), Cognitive Disorder (not otherwise specified), PTSD, and Specific Phobia Situational Type. (R. 495). Plaintiff had been treated for depression for ten (10) years, and PTSD for three to four (3-4) years. (R. 498). She also conducted a mental status examination of Plaintiff and reviewed his relevant history. Id.

Psychologist Posey observed that Plaintiff walked with a slight limp. (R. 497). Plaintiff's attitude, behavior, orientation, and thought processes appeared normal. Id. His mood appeared anxious; she observed "notable tremors" in Plaintiff's hands, and fidgeting throughout the interview. Id. Plaintiff's immediate and remote memory were normal, but his recent memory was moderately deficient. Id. Plaintiff denied suicidal or homicidal thoughts, but reported hearing unusual noises at night, "such as glass breaking [and] people knocking on the door," which causes him to get up three to four times at night to check on them. Id. He reported that his doctors told him this could be related to his medication. Id. Posey diagnosed PTSD and Depressive Disorder (not otherwise specified), citing support for these diagnoses:

> The claimant reported problems with nightmares and bad dreams three to four times per week, startling awake with sweating, shortness of breath, tightness in his chest, headaches, interrupted sleep, decreased energy, easily aggravated. The claimant reported inability to being in crowds, avoidance of fireworks, and tv program[s] with violence or

war scenes. He reported at night he hears glass breaking, people knock on the door and arising to check three to four times per night. The claimant reported feeling sad at times, worrying excessively, and racing thoughts.

(R. 496). Her prognosis for Plaintiff was "poor," given Plaintiff's extensive treatment history and his numerous medical problems, which likely contributed to his mental health issues. (R. 498).

On March 19, 2013, Bennett Orvik, M.D., an agency reviewer, completed a Consultative Examination (CE) of Plaintiff. (R. 715). Dr. Orvik noted review of VA records; he also completed a physical examination of Plaintiff and identified a few problems pertaining primarily to Plaintiff's joint and spine. (R. 718). Plaintiff's shoulder motion was normal, with the exception of abduction being "approximately 160 degrees bilaterally." Id. Left knee results were normal, though right knee flexion/extension was reduced to "perhaps 120 degrees" on the right. Id. Plaintiff's gait showed a "right-sided limp." Id. Plaintiff was able to bend to 70 degrees; he could not fully squat, but rose from the partial squat without trouble. Id. Apart from these joint and spine issues identified, Dr. Orvik also noted "4+ obesity," Plaintiff's hearing is "somewhat decreased," and that Plaintiff sometimes has trouble picking up small objects with his hands.

Dr. Orvik opined that Plaintiff's "current treatment appears to be reasonably appropriate for his various medical problems, although he is taking chronic narcotic pain medication for nonmalignant disease," and "his arthritic problems would be much more likely to improve if he was able to lose a significant amount of weight." (R. 719). He further opined that "[p]rognosis for significant improvement is not very good," and that Plaintiff's chance of returning to work were "next to none." Id.

### c. DIB at Reconsideration Level

On June 13, 2013, Fulvo Franyutti reviewed Noon's prior assessment and affirmed it as written, with no comment or explanation. (R. 116). On June 18, 2013, Patricia A Clark, Psy.

D., reviewed Dr. Hursey's prior assessment and, finding it to be "reasonable [and] consistent with the medical evidence" and providing explanations under each item, affirmed. (R. 113).

### d. Functional Capacity assessment by Treating Physician

A Physician's Functional Capacity Statement was filled out by Jack Riggs, PA-C, and signed by both PA-C Riggs and James Arnett, M.D. on July 17, 2014. (R. 1368). They opined that Plaintiff could occasionally lift/carry less than ten (10) pounds and frequently carry ten (10) pounds. Id. Plaintiff could stand and/or walk less than two (2) hours, and sit for less than six (6) hours in an eight-hour workday, though he must periodically alternative sitting and standing to relieve pain or discomfort. Id. Plaintiff's ability to push and/or pull was limited in upper and lower extremities. Id. These opinions were supported by citing to Plaintiff's:

> [L]ong standing problems secondary to several medical issues, chronic hypertension secondary to Liddle's Syndrome, severe fibromyalgia worse over past 2-3 years [for which Plaintiff] has received the maximum (40%) rating. Chronic low back pain radiating to left lower extremity. Prior knee replacement [with] reduced [range of movement]. Chronis swelling [and] pain with use[, and] chronic fatigue.

Id. As to postural limitations, the physicians opined that Plaintiff could occasionally balance, climb ramps/stairs "only as needed," and never climb ladders, ropes, or scaffolds; never stoop, kneel, crouch, or crawl. (R. 1369). Explaining these opinions, PA-C Riggs wrote "Veteran should avoid postural activity due to his fibromyalgia, knee, hips, and low back pain." Id. As to manipulative limitations, the physicians opined that Plaintiff could withstand unlimited feeling, but his ability to reach was limited, and his ability to handle or finger objects was limited "some," citing "limited twisting and turning due to fibromyalgia, hypertension, [dizziness, and] [illegible]." (R. 1370). They opined that Plaintiff's tinnitus somewhat limited his hearing; his speaking ability was not limited. (R. 1371). "N/A" was written on the Visual Limitations section, with no opinions provided either as to limits or the lack thereof; because the record

indicates Plaintiff was seen in the VA opthamology clinic, it is logical that these physicians apparently felt unable to opine one way or the other as to Plaintiff's visual abilities. (R. 1370). As to environmental limitations, the physicians opined that Plaintiff should avoid all exposure to extreme cold/heat, wetness, humidity, noise, vibrations, fumes, and hazards. (R. 1371). They added that "Veteran is unemployable due to combination of several severe physical impairments, but also significant nonexertional impairment related to PTSD and anxiety." Id.

### e. Consultative Examinations (VA)

On February 18, 2014, an in-person consultative (C&P) examination was conducted by Susan Givens, PA-C, for the VA reviewing Plaintiff's high blood pressure, ankle conditions, endocrine diseases, and kidney conditions. (R. 1311). In addition to Plaintiff's high blood pressure and history, Plaintiff also indicated that high blood pressure caused dizziness and headaches. (R. 1314). Plaintiff's ankle diagnosis was described as "right ankle injury with traumatic arthritis," which Plaintiff reported flares "at least once every two weeks," and gives out at times when merely standing. (R. 1316). Upon physical examination, Plaintiff exhibited functional loss/impairment in his right ankle as follows: less movement than normal, excess fatigability, pain on movement, disturbance of locomotion, pain on palpation, and interference with sitting, standing, and weight-bearing. (R. 1319-20). Muscle strength was normal, and no laxity or akylosis was observed. (R. 1320). Plaintiff's use of a cane was noted, as well as a "CAM walker boot." (R. 1322). This diagnosis was further supported by abnormal imaging studies of Plaintiff's right ankle showing degenerative/traumatic arthritis, asymmetry of the ankle mortise joint, ossicles, a small plantar calcaneal spur, and mild bony protuberance; none of these were considered "acute" abnormalities. (R. 1324). The functional impact of Plaintiff's ankle

conditions included "difficulty with prolonged standing" and "going up and down hill/stairs/uneven ground in general," and being unable to squat. Id.

As to endocrine diseases, Plaintiff was diagnosed with Liddle's syndrome, which presented with symptoms of fatigue, weakness, and chronic constipation, and caused his high blood pressure. (R. 1326). Plaintiff's chronic renal (kidney) dysfunction is marked by persistent proteinuria and edema with associated hypertension, and is supported by lab work completed over the past few years at the VA. (R. 1333). This, too, affects Plaintiff's ability to work; particularly via chronic fatigue. (R. 1344).

Audiologist S. Luanne Merrit, Au. D., also reviewed Plaintiff's hearing loss and tinnitus. (R. 1346). She diagnosed sensorineural hearing loss (between 500-4000 Hz) in Plaintiff's left and right ears. (R. 1348), and noted that his tinnitus was likely the result of exposure to hazardous noise as a crane operator, as well as exposure to a nearby explosion. (R. 1350).

On March 31, 2014, another examination was conducted PA-C Givens, this time reviewing back conditions, fibromyalgia, and range of movement. (R. 1275). PA-C Given examined Plaintiff in person and concurred with the previous diagnosis of fibromyalgia first made in December 2010. (R. 1276). She noted widespread musculoskeletal pain, stiffness, and muscle weakness that is "near constant" and "generalized." (R. 1277). Plaintiff also experienced fatigue, sleep disturbances, parasthesias, headache, depression, anxiety, and Raynaud's-like symptoms that is "near constant" and aggravated by weather, stress, and overexertion. (R. 1278). Plaintiff was positive for sixteen (16) of eighteen (18) trigger points, all on both the right and left sides. Id. PA-C Givens opined that his fibromyalgia impacts his ability to work. (R. 662)

PA-C Givens also identified lumbosacral strain and degenerative arthritis of the spine. (R. 1280). She recorded objective evidence pursuant to physical examination and manipulation as to

Plaintiff's range of motion – indicating where extension ends, flexion ends, and objective evidence of painful motion begins. (R. 1281-84). Plaintiff also had functional loss or impairment of his back, demonstrated by having less movement than normal, excess fatigue, pain on movement, disturbance of locomotion, interference with sitting, standing, and/or weight-bearing, and lack of endurance (R. 1284). Pain on palpation and muscle spasms causing abnormal gait were also noted. Id. Plaintiff's left knee demonstrated hypoactive deep tendon reflexes. (R. 1286).

Plaintiff exhibited a positive straight leg raising test for his left leg (negative in his right leg). (R. 1287). Plaintiff also demonstrated radicular pain (compressed nerves) that is mild to moderate in both legs, moderate numbness in both legs, mild parathesia in his right leg, and severe parathesia in his left leg. Id. Plaintiff's radiculopathy involved his lumbar (L4, L5) and sciatic (S1, S2, and S3) nerve roots, and was mild on the right side, but moderate on the left. (R. 1288). Plaintiff also exhibited Intervertebral Disc Syndrom (IVDS) of the thoracolumbar spine. (R. 1288). She noted that Plaintiff used a cane as an assistive device. (R. 1289). Imaging results of Plaintiff's back documented arthritis in his spine, showing "minimal endplate osteophyte formation at the right and left lateral aspects of the superior endplate of L3," though no evidence of degenerative change was visible and the degenerative change to Plaintiff's endplate was considered "minimal." (R. 1290). PA-C Givens opined that Plaintiff's back conditions impact his ability to work, in that he would "have difficulty with prolonged standing, walking, prolonged sitting, bending, twisting, lifting/carrying, driving for any prolonged period, [and] climbing stairs/ladders." (R. 1291).

### f. Mental Health Examination

On April 4, 2014, Plaintiff underwent a second mental health consultative examination

for the VA, as an update to his previous examination in 2012, completed by Psychologist John Damm, (R. 1263). Plaintiff reported significant difficulty at this time:

> The veteran said that he doesn't go anywhere. He said that it might be weeks before he leaves the house. Charles reported that he doesn't have energy to do the things he needs to get done . . . he sleeps more and just watches TV during the day. The veteran said that he didn't leave his bed, yesterday, until 7 pm.

(R. 1269).

Plaintiff reported that he can help around the house "a little bit." (R. 1269). He reported attending "some of his daughter's softball games." (R. 1271). He spends time with his wife and kids "when they are around," but that is not often; they "aren't home much." (R. 1269 – 1271). Outside his immediately family, Plaintiff does not have friends or spend time with extended family. (R. 1269). He spends "more time with [his] dog than anybody." Id.

> He reports that he feels "pretty well frustrated" . . . he has thought about suicide. He said that he feels that things won't get better and he feels stuck. He said that he lives for [his] dog; his wife and children aren't home much. "I'm pretty much disgusted with myself. I can't do nothing; I gain weight."

(R. 1269-70).

## C. Testimonial Evidence

Plaintiff was born on August 25, 1967, and was 45 years old at the time he filed his DIB claim. (R. 260). He completed high school and two years of college, but does not have a college degree (R. 75). Plaintiff's prior work experience included serving as a crane operator in the Army, and most recently as a correctional officer in the Pruntytown Correctional Center. (R. 77). He was married at the time he filed his initial claim and at the time of the administrative hearing; he lives with his wife, Betsy. (R. 74). Plaintiff has two children; he reported to Dr. Posey in March 2013 that his son was 19 and his daughter 15 at that time. (R. 496). Plaintiff alleges

disability based on Stage 3 chronic renal failure, Post-Traumatic Stress Disorder ("PTSD"), bulging discs in his back, Diabetes and related leg pain, and Fibromyalgia. (R. 78-79).

Plaintiff testified that he served as a crane operator in the Army until 1991, when he "got out;" he began receiving VA disability at that time. (R. 76). He subsequently worked as a correctional officer at Pruntytown Correctional Center, where he supervised other officers on his shift. (R. 77). In this job, the most Plaintiff lifted or carried up to 150 pounds. Id. Plaintiff retired from that job - on disability - because "[he] couldn't continue working." Id. Plaintiff explained he had a lot of pain from both his back and right knee, his PTSD was "aggravat[ed];" he "couldn't concentrate on what [he] was doing and was causing there," and "forg[o]t stuff." Id.

The ALJ asked Plaintiff what conditions he has that lead him to believe he cannot work at this time. (R. 78). Plaintiff suffers from PTSD, chronic renal failure ("Stage 3 most of the time"), back pain from bulging discs, diabetes and associated leg pain, and fibromyalgia. (R. 79). In response to questioning by his attorney, Plaintiff described how his conditions impact him:

> Q  Now, Mr. Murphy, you mentioned kidneys. Just on an average day, how do you feel throughout an average day?
> A  I don't feel very good at all. I have a hard time staying awake. I'm exhausted most of the time.
> Q  And is it fair to say that the VA has given you a fibromyalgia rating?
> A  Yes. That's what I was forgetting, the fibromyalgia, it gives me a lot of trouble.
> Q  What kind of trouble does fibromyalgia give you?
> A  I'm in pain most of the time and stiff and I can't – it causes me to not be able to concentrate, so my mind is just foggy most of the time.
> Q  Does standing up and -- I mean, how does standing up at various points in the day affect your fibromyalgia?
> A  It don't help it any. . . I'm on pain medication most of the time.
> Q  And what does this pain medication do to you?
> A  It makes me drowsy and can't concentrate and stuff.
> Q  And I think you mentioned PTSD.
> A  Yes. Yes.
> Q  What -- how does PTSD make you feel?
> A  It -- mostly depressed, most of the time I can't think. I have intrusive thoughts during the day and my -- I just -- it just I can't be around crowds too much. That, that bothers me a lot.

Q       And how does it affect your ability to stay focused on a, on a task?
A       I can't focus at all. I get sidetracked and I forget stuff and
Q       What, what stuff do you forget?
A       Like just I forget what, what I'm doing. And like if I'm talking to my wife or something I forget, I forget what we're even talking about half the time. She gets on me about that.
Q       Let me, let me jump back here to kidneys for a minute.
A       All right.
Q       When you -- I think you said you get tired or you're tired throughout the day. What do you do when you get tired?
A       Well, I'm bed, bed most of the time or on the couch sleeping. Always tired, I just get wore out really quick.
Q       Well, how much of your day is spent sleeping on the couch or just sleeping in general?
A       Probably eight, ten hours during the day. And at night I sleep. Just don't do nothing anymore.

BY ADMINISTRATIVE LAW JUDGE:
Q       So, how do you spend your days, then?
A       I spend my days on the couch or in bed.
Q       And how long have you been just laying on the couch or in bed?
A       Since I retired.
Q       And when was that?
A       November 2012.
Q       You don't do anything at all?
A       No. I stay there at the house and I can't mow grass or anything. I can't stand the heat. Heat just absolutely wears me out, any heat, especially during the summer. And I don't do nothing to be honest with you, Judge.
Q       Don't do anything at all?
A       No, nothing. Just sit around at the house and watch TV.
Q       Do you cook?
A       No.
Q       Clean?
A       No.
Q       Any laundry?
A       No, ma' am.
Q       Do any grocery shopping?
A       No.
Q       Got any hobbies?
A       Not that I can do.
Q       Okay. What hobbies did you have?
A       I like to go hunting.
Q       And when did you last go hunting?
A       It's been 2012 probably. And like to go fishing. I haven't been fishing in many years. Afraid of falling in the water. I enjoy working on cars, but I can't do. I can't get up and down a car, around. Can't do that.
Q       When's the last time you worked in a car?

<table>
<tr><td>A</td><td>Oh, it's been 2010, somewhere around there.</td></tr>
<tr><td>Q</td><td>And what treatment are you receiving for the kidney disease?</td></tr>
<tr><td>A</td><td>I -- my medication, Amiloride and Hydrochlorothiazide and potassium.</td></tr>
<tr><td>ALJ:</td><td>Okay. Thank you.</td></tr>
</table>

(R. 78-81).

## D.   Vocational Evidence

Also testifying at the hearing was Linda Dezack a vocational expert. Ms. Dezack characterized Plaintiff's past work as a corrections officer as heavy work (as actually performed by Plaintiff based on his testimony), low skilled, with a specific vocational preparation ("SVP") of six. (R. 82). With regards to Plaintiff's ability to return to his prior work, Ms. Dezack gave the following responses to the ALJ's hypothetical:

> ALJ:   I ask that you assume an individual of the same age, education, and past work experience as the Claimant with the following abilities. Said individual is capable of light exertional level work; can never climb ladders, ropes or scaffolds; and never crawl. Said individual can occasionally climb ramps or stairs, balance, stoop, and crouch, and kneel. Said individual must avoid all exposure to extreme cold and extreme heat; and must avoid concentrated exposure -- actually all exposure to wetness or humidity; and concentrated exposure to excessive vibration and irritants such as fumes, odors, dusts, and gases; and must avoid all exposure to any hazards such as dangerous moving machinery and unprotected heights. Said individual is limited to simple, routine, and repetitive tasks in a low stress job defined as having no strict production quotas. Said individual is capable of occasional interaction with the general public, coworkers, and supervisors. Can an individual with these limitations perform the Claimant's past work?

> VE:   Based upon the hypothetical, no, the individual would not be able to perform the past work as the past work's skill level is greater than unskilled mentioned in the hypothetical.

(R. 83). Incorporating the above hypothetical, the ALJ then questioned Ms. Dezack regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels. Finally, the ALJ questioned Ms. Dezack about Plaintiff's ability to work if he is completely credible as to the severity of his condition:

Q    And if an individual were off task or to miss work 20 percent of the work week or greater, would there be jobs available for this individual?

A    No, there is no job in the national economy that would allow an individual to be off task 20 percent of the time. 10 percent or 6 minutes of 60 is permissible.

Q    And one other question. With regard to the jobs that you gave, if the individual was to have no interaction with the general public in addition to the -- all of the other requirements, would those jobs at the sedentary exertional level remain available or would any of them be eliminated with that additional --

A    No, there would be –

Q    -- restriction?

A    There would be no contact with the public.

Q    And what about for the light jobs that you provided, would any of those be eliminated with that additional limitation?

A    No, the same.

(R.86).  Plaintiff's  attorney  questioned  Ms.  Dezack  as  to  what  constituted  a  hazard  in  a workplace.

Q    Ms. Dezack, the -- let's go with the deli cutter and slicer.
      Well, let's backtrack. What's a, what's a workplace hazard? And
      what's -- I mean, what is a hazard in a workplace?

A    It would be any, any injury that could be sustained by a piece
      of equipment or another person or an object within that workplace.

Q    Okay. And this deli cutter and slicer, is it fair to assume
      that you're using sharp equipment to cut meat?

A    Yes.

Q    And is it fair to assume that sharp equipment could cause an
      injury?

A    It could.

Q    Is that sharp equipment a workplace hazard?

A    It could be if not followed proper instructions to avoid those
      hazards.

Q    And so, he would still be -- following instructions or not,
      he's still exposed to the hazarc as a deli cutter/slicer?

A    Well, there would be hazards in any job. And if proper
      following of instructions is not followed, then that individual would
      sustain an injury.

Q    So, there's hazards in all jobs?

A    There would be.

(R. 86). Plaintiff's attorney next questioned Ms. Dezack regarding limitations:

Q    Okay. Now, if a person was limited to, limited to no
      interaction with coworkers or supervisors, how would that affect a
      person's employment?

| A | The individual wouldn't be able to sustain competitive employment as even with supervisory interaction, it would be at least minimal if not negligible contact. |
|---|---|
| Q | And so, no interaction means they couldn't do any job? |
| A | Correct. |
| Q | And this off task, this 10 percent 6 minutes out of every doesn't matter what you're doing to be off task it's just that you're off task? |
| A | You can |
| Q | Is that fair to say? |
| A | That would be fair. |
| Q | So, retreating from the workstation to go do whatever for more than six minutes every hour is -- outside of the normal breaks is going to be considered off task? |
| A | Correct. |
| Q | And so, I assume laying down is not permissible at work? |
| A | Would not be, no. |
| Q | And I'm sure sleeping, nobody wants a worker sleeping while they're at work, do they? |
| A | They don't. |
| Q | So, a person sleeping is not going to be able to sustain employment? |
| A | Correct. |

(R. 87-88).

The ALJ concluded the hearing at this point, only to come back on the record shortly thereafter:

| HA: | Okay. We are back on the record at 11:17 a.m. |
|---|---|
| ALJ: | Okay. When the Claimant stood up to leave I noticed that he had a cane and I didn't recall any testimony with regard to the cane and I did not discuss any possible limitations with regard to the cane. So, I'm going to ask a few questions of the Claimant with regard to that. |

BY ADMINISTRATIVE LAW JUDGE:

| Q | Has that cane been prescribed for you, sir? |
|---|---|
| A | Yes, ma'am. |
| Q | When? |
| A | About six months ago. |
| Q | And who prescribed it? |
| A | Jeff Riggs. |
| Q | That PA? |
| A | The PA, yes. |
| Q | And how often do you use it? |

18

| | |
|---|---|
| A | I use it all the time. |
| Q | Like what are you doing when you use it, to do what? |
| A | Walk, when I walk. |
| Q | When you walk where? |
| A | In the house. |
| Q | Go anyplace else with it? |
| A | Like when I come here. |
| Q | Anyplace else? |
| A | No, I don't do nothing else really. |

(R. 90-91)

REEXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE

| | |
|---|---|
| Q | And so, then, Ms. Dezack, you were previously sworn. I wanted to ask you a couple questions. On the light jobs that you provided with that first hypothetical, if a limitation were added such that the job must accommodate the use of a cane or other assistive device for ambulation or balance, would that change or eliminate any of those jobs you gave, the hospital products assembler, the folding machine operator, and the deli cutter/slicer? |
| A | Yes. It would eliminate all three jobs as the individual wouldn't be able to remain on task and complete job tasks if utilizing a cane for ambulation and balance. |
| Q | Would there be other jobs within the limitations given that -at the light exertional level with that additional limitation? |
| A | There would not be. |
| Q | And what about the sedentary jobs that you provided, would they remain available or would any of them be eliminated with the addition of the use of a cane? |
| A | The three (INAUDIBLE) jobs mentioned in hypothetical three, the sedentary level, would remain available. |
| Q | And that's the document preparer, the touchup screener, and the cutter and paster? |
| A | That's right. |
| Q | And what about the type copy examiner and the hand sorter, would those remain available if an individual would be required to use a cane? |
| A | Yes, they would be. |

(R. 91-92).

### E.    Disability Reports

A disability report form dated November 29, 2012 listed Plaintiff's conditions as "diabetes, PTSD, right knee replacement, renal failure, high blood pressure, fibromyalgia, arthritis, Liddles syndrome, right hip bursitis, [and] tumor on right adrenal gland." (R. 392). The medications Plaintiff was taking at that time included Amiloride and Potassium for his kidneys; Atenolol for heart rate; Aatrozastatin for cholesterol; Cyclobenzaprine (muscle relaxant); Glipizide and Insulin for diabetes; Hydrochlorothiazide for high blood pressure; Hydrocodone for pain; Modafinil for alertness; Ometrazole for acid reflux; Tamsulosin for his prostate; Trazodone for sleep; Wellbutrin for depression; and Hydroxyzine, Sertraline, and Topiramate for PTSD/depression. (R. 396).

In a subsequent disability report on May 8, 2013, Plaintiff added the following updates:

My Diabetes continues to get Worse, I have since had problems with my visual field and My Doctor suspects me to have Glaucoma due to my diabetes. I also have been having severe problems with my fibromyalgia. I have been extremely depressed. I am having a harder time walking due to the arthritis in my Ankles, Knees, Hips, and Lower Back. And although I cannot get the Veterans Administration to diagnose me with it I think I have Gulf War Syndrome which is Due to My Service in Desert Shield and Desert Storm.

My New Physical and Mental Limitations are I am having more and more of a hard time walking due to the artheritis [sic] in my Ankle , Knees, Hips and Lower Back. Mentaly [sic] I am Severely Depressed and I have a hard time doing anything. I have No Ambition to do anything anymore.

My New Conditions are Fibromyalgia which is dibitating [sic]. I should have listed this on my original claim. I am In extreme pain most of the time. I have Dry Mouth, My mouth is always extremely dry due to my diabetes.

(R. 402). In addition to his existing prescriptions, Plaintiff had also begun taking Buproprion for depression; Cholecalciferol for low vitamin D; Lisinopril for Liddles Syndrome and Hypertension/Cardiomyopathy; Oxybutynin Chloride for enlarged prostate, and Sildenafil for erectile dysfunction.(R. 406-408). Plaintiff added:

> I am appealing my recent decision due to My Medical and Mental Conditions do forbid me from working. Liddles Syndrome, PTSD, Depression, Fibromyagia, Knee Replacement, Diabetes, Hypertension, Severe Arthritis and Acute Renal Failure and the Side effects of the medications I must Take cause me to be Unable to Work. My Education Is Geared Towards The Correctional Officer Field of Work which I am Not Physically able to do now. At My Previous Job at Pruntytown Correctional Center I Attempted on a few occasions to move to another Position in the Prison Due to my medical condition. I was Rejected these Positions because I do not have a Degree. I have tried to continue working. This is my last Option I am Physically and Mentally unable to continue working, Stress is a major problem and Depression. Please Reconsider My Claim. I do need Help. Thank You For your time.

(R. 410). In a subsequent disability report dated July 16, 2013, Plaintiff reported that he had additionally been diagnosed with diabetic neuropathy in addition to his existing conditions. (R. 423) added the following narratives:

> In June 2013 I was Diagnosed with Diabetic Neuropathy, My legs from my hips down to my feet ache like a toothace [sic]. My feet are between numb and tingling like they are asleep all the time. I am on Hydrocodone 10 mg and it hardly touches that pain. It is Driving Me Crazy. [It] is causing me [] to loose [sic] sleep and I am having difficulty walking due to the pain.

(R. 423). His interactions were deteriorating, as well:

> I am having more trouble dealing with people. Do Not feel comfortable around people. Not very Trusting of people now. Dont have any patience with people. and I am having trouble with my legs Neu[r]opathy can't get around as good as I was. Cant Sleep due to the pain.

Id. Information about Plaintiff's activities at this time was updated as follows:

> I have difficulty with putting my pants underwear socks and shoes on due to my lower back and hip problems . . . I have difficulty walking with my Neuropathy in them. I Cannot Stand but for very sort periods of time (neuropathy). Moving my arms using my hands and Fingers I do have some difficulty with I get fatigued Very Easily I think it is due to my Cardiomyopathy. I have extreme difficulty with lifting due to my lower back condition. I can and do help my wife with some housework as much as i can. I Do Not Visit relatives, or go to religious services or attend social clubs. I do not have friends. I would rather stay away from most people. I do not drive my vehicle very often now due to the Issues I have with falling asleep while driving. I have extreme difficulty climbing steps.

(R. 427). Lastly, in the remarks section, Plaintiff added:

> I wish to say that in my Reconsideration Letter Dated June 26 2013 it states that the medical Evidence does not indicate that my Renal Failure, Liddles Syndrome or adrenal tumor prevent me from working. Liddlles Syndrome and Renal Failure are very serious. I suffer every day with pain from my kidneys, my legs my feet my back. I cannot remember the last day that I was not in pain. Pain wears on a person till they cannot take any more. I have been to the point of no return and With the Grace of God I have a Wonderful Wife, and a Grandfather who was a minister that helped raise me that entered my head, and i am here still suffering.

(R. 428).

## F.    Lifestyle Evidence

On an Adult Function Report dated December 3, 2010, Plaintiff reported that Depression and PTSD affect his ability to concentrate, complete assigned tasks, and get along with others. (R. 368). Fibromyalgia and arthritis of the lower back, right hip, knee, and ankle affect his ability to walk, sit, stand, run; he cannot drive without taking medication (presumably, pain medication). Id. He also fell asleep while driving. Id. Plaintiff reported that his conditions cause him to miss work. Id.

Plaintiff described his daily activities as follows:

> I get up between 12:00 p.m. & 1:00 p.m. I eat my breakfast/lunch, I lay on the couch, I go out & get the mail, I lay down on the couch, watch TV, I eat dinner and I lay on the couch watching TV until bedtime which is usually between 1:00 a.m. and 4:00 a.m.

(R. 369). Plaintiff reported that he does not care for any other people or animals; his children care for their dogs. Id. Before his illnesses, he could do anything he wanted to do; now, he cannot do the things he used to. Id. Plaintiff reported his conditions affect his sleep in that his PTSD causes nightmares; his sleep apnea prevents him from getting restful sleep, and his PTSD (cannot tolerate masks on his face; phobia) presents him from using a CPAP machine. Id. At this time, Plaintiff indicated no problems with personal care and does not need reminders. (R. 370).

He did, however, report needing reminders to take medicine; his wife helps him "get [his] medicine together" and reminds him to take them because he "forget[s] and think that [he has] already taken it." (R. 370). Plaintiff reported that he used to cook often, especially breakfast, but he no longer cooks because he forgets that he has things on the stove which is a hazard, and cannot stand long enough to cook. Id.

Plaintiff reported that he is able to use a riding mower to mow the law for half an hour each week; he also does some laundry, estimated at two (2) hours per week. (R. 370). He reported generally needing help getting started these things – and things in general – because his depression and fibromyalgia pain rob him of energy and ambition. Id. He does not do any other house or yard work apart from this, because he is "in pain most of the time" and "can't get off the couch to do anything" else. (R. 371). Plaintiff reported that he can go out by himself usually, though he "rides in a car" because he "cannot concentrate enough to drive, and fell asleep." Id. Plaintiff reports that his shopping is limited to quick trips of ten (10) minutes to nearby convenience store. Id.

Plaintiff reported his ability to handle money has changed as a result of his conditions, and that "memory problems end up causing overdrafts." (R. 371-72). Plaintiff reported his hobbies as hunting, fishing, watching football on television, though he is no longer able to do anything other than watch television. Id. He cannot hunt any longer, due to pain in his right knee, right ankle, right hip, and lower back; he cannot hunt or fish while taking hydrocodone due to safety concerns. Id.

Plaintiff used to have friends that he would spend time with, but has become a "loner" as a result of depression and PTSD. He does not spent time with others; the only place he goes on a regular basis is to the VA hospital for doctor's appointments. (R. 373). Plaintiff does not like

meeting new people, and he reported that he does not socialize with people. Id. Because of his PTSD, he cannot be around people – "no crowds" – and he does not trust anyone. (R. 373).

As to his abilities, Plaintiff reported that his ability to lift, squat, bend, stand, reach, use his hands, walk, sit, kneel, hear, and climb stairs is greatly diminished by fibromyalgia and arthritis. (R. 373). He reported that he "used to be very strong; now if [he] lift[s] anything over 25 lbs, [he] hurt[s] for days." Id. Plaintiff can walk one hundred (100) yards before needing to stop and rest for at least two (2) minutes. Id. Depression and PTSD have affected his ability to remember, complete tasks, concentrate, understand, follow instructions, and get along with others. Id. He can pay attention for three to five (3-5) minutes, and does not finish what he starts. Id. He reported not being able to follow spoken instructions very well because he "usually forget[s] part of it and lo[ses] concentration of what [he is] doing." Id.

Plaintiff reported getting along with authority figures "ok, but when [he] think[s he is] right things might get ugly[, he] will not give up." (R. 374). He denies ever being fired or laid off from a job because of problems getting along with other people. Id. Plaintiff handles problems that he can solve well, but he does not handle stress well for things he has no control over. Id. He dislikes changes in routine and does not handle them well. Id.  His PTSD causes him additionally to have fears of fireworks overhead, and crowded places he has "no control of." (R. 374). Plaintiff stated: "If I go to a restaurant I must sit where I can see the front door with my back to the wall where I can see everyone, I also look at each person that I see to check their hands and see if anything unusual." Id.

Plaintiff has an artificial knee, and also uses a hearing aid and glasses. (R. 374). At the time of this report, Plaintiff was taking various medications: Buproprion, Hydrocodone,

Sertraline, and Topiramate (R. 375). He reports side effects of dry mouth and constipation, dizziness, loss of coordination, and tingling in his hands and feet. Id.

On a subsequent Adult Function Report dated May 13, 2012, Plaintiff related that his conditions had worsened and caused him additional difficulty. (R. 412). Whereas his previous report in December 2010 indicated no problems with personal care, Plaintiff reported that he now had trouble balancing while trying to get dressed (in particular, putting on pants)/ (R. 413). He has to "be real careful in the shower with slipping," and had trouble tying his shoe. Id. Plaintiff reported that he "forget[s] to take a bath/shower and [his] wife has to remind [him] to do this." (R. 414). He also now relies on his wife to help him determine if he has taken all of the medication he was supposed to take. Id.

Plaintiff further reported as to housework and yardwork that all he does now is mow the grass once a week using a riding mower; he no longer does other housework as he did before because he gets "exhausted very easily and [is] in pain 90% of the time." (R. 415). He reports that this weekly mowing is also difficult, because he has trouble with the heat; it makes him light-headed and dizzy. Id. Plaintiff reports that his driving, previously limited to only very short trips to a nearby convenience store, is now further limited to only twice per month for 15 minutes at a time ("only in and right out"). Id. His wife now handles all finances for them, including paying bills, because he "forget[s] too much" and overdraws their account. Id.

Plaintiff reports he is unable to hunt or fish, and his activities are limited to "a little bit of gardening in my flower pots on my back porch." (R. 416). Plaintiff reported increased mood difficulties; his ability to get along with others had worsened from his previous report, and he appeared increasingly bothered by changes in routine. (R. 419).

# IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.  The claimant has not engaged in substantial gainful activity since November 14, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: diabetes mellitus, chronic kidney disease stage II-III; sleep apnea/obstructive sleep apnea; degenerative disc disease of the lumbar spine; Liddle's Syndrome; hypertension; osteoarthritis of the right knee with history of knee replacement; morbid obesity; fibromyalgia; affective disorder; anxiety disorder; posttraumatic stress disorder; personality disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(11), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except work must: never entail climbing of' ladders, ropes or scaffolds; be limited to occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling or crawling; avoid all exposure to extreme cold, extreme heat, wetness or humidity, excessive vibration, irritants such as fumes, odors, dust and gases and all exposure to any hazards such as dangerous moving machinery and unprotected heights; be limited to simple, routine, and repetitive tasks in a low stress job defined as having no strict production quotas, occasional interaction with the general public, co-workers, and supervisors; and accommodate the use of a cane or other assistive device for ambulation or balance.

6.  The claimant is unable to perform any past relevant work (20 CPR 404.1565).

7.  The claimant was born on August 25, 1967 and  was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CPR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CPR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 14, 2012, through the date of this decision (20 CFR 404.1520(g)).

(R. 22-38).

# VI.      DISCUSSION

## A.      Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by

substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

Plaintiff, in his Motion for Summary Judgment, asserts that the Commissioner's decision "is not supported by substantial evidence." (Pl.'s Mot., ECF No. 9 at 1).  Specifically, Plaintiff alleges that the ALJ erred by:

1. Failing to afford the VA determination of disability substantial weight without providing good reasons and clearly demonstrating that such deviation is appropriate;

2. Assigning reduced weight to the opinions and assessments of treating physicians.

ECF No. 10 at 5 and 11, respectively. Plaintiff asks the Court to "remand the case for the sole purpose of calculating benefits as the record," or in the alternative, that a remand be issued (<u>Id</u>. at 15).

Defendant, in her Motion for Summary Judgment, asserts that the decision is supported by substantial evidence and should be affirmed (ECF No. 12 at 15). Specifically, Defendant alleges that substantial evidence supports the ALJ's decision with respect to the weight afforded to both the VA disability determination and the treating source medical opinions. (ECF No. 12).

**C.   Analysis of the Administrative Law Judge's Decision**

**1.   ALJ Kostol's failure to give appropriate weight and consideration to disability determinations of other agencies**

The State of West Virginia Consolidated Public Retirement Board awarded Plaintiff

disability retirement on November 2, 2012. (R. 379; <u>see also</u> R. 1148). The VA granted individual unemployability entitlement for Plaintiff effective November 15, 2012, "because [he] is unable to secure or follow a substantially gainful occupation as a result of service connected disabilities." (R. 1146).

### a. ALJ Kostol erred by failing to afford substantial weight to the VA determination of 100% disability.

In <u>Bird v. Commissioner of Social Sec. Admin.</u>, the Fourth Circuit addressed the weight that must be afforded to a VA disability rating and held that the Social Security Administration must give substantial weight to a VA disability rating. 699 F.3d 337 (4th Cir. 2012). In so holding, the Fourth Circuit noted that there are compelling reasons to afford a VA disability substantial weight, in that "both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations, and both require claimants to present extensive medical documentation in support of their claims." <u>Id</u>. at *343 (internal citation omitted).

In this particular case, where the disabling conditions of a Plaintiff are themselves "service-connected" – i.e., a recognized result of one's military service – there is an additional compelling reason to afford substantial weight to a VA disability determination: the VA, as often the sole healthcare provider to veterans, is uniquely positioned to have additional insight into conditions that are associated with a particular group of veterans by virtue of their deployment to a particular location. They can compare data in the aggregate, and thus identify patterns amongst veterans. This is particularly compelling here, as Plaintiff's medical records from the VA explain.

Plaintiff's VA disability determination, in addition to documenting many conditions he was treated for and many medications that he was prescribed, further specifically addresses

conditions that the VA considers to be connected to service in the Gulf War in Southwest Asia. The VA reviewer cites ""Gulf War and Health: Volume 8: Update of Health Effects Serving in the Gulf War." (R. 534). Further, the Fibromyalgia Questionnaire remarks include, in relevant part, that "Fibromyalgia is a 'diagnosable but medically unexplained chronic multi-symptom illness of unknown etiology.' Fibromyalgia is considered a presumptive chronic disability pattern associated with the Southwest Asia environmental hazards." (R. 549).

> The notes in Plaintiff's VA record regarding this chronic pain/fatigue disorder note that:
>
> Veteran was diagnosed with fibromyalgia on C&P exam 12/10, however, states he has not received SC [service-connected disability] for this condition. The Cfile was not sent for review, therefore, I am unable to determine why this was not granted or why this exam is requested again.

(R. 534). The reviewer goes on to note that continuous medication is required for Plaintiff's fibromyalgia symptoms, including Hydrocodone, Cyclobenzaprine, and Topiramate, but that Plaintiff's fibromyalgia symptoms were "refractory" – unresponsive – to therapy. (R. 546).

An ALJ may deviate from substantial weight only when "the record before the ALJ clearly demonstrates that such a deviation is appropriate." Id. at *343. This exception is recognized because 1) the SSA employs its own standards for evaluating a claimant's alleged disability, and because 2) the effective date of coverage for a claimant's disability under the two programs likely will vary." Id. Here, ALJ Kostol has failed to demonstrate – clearly or otherwise – that such deviation is appropriate.

Unlike in Bird, the coverage date is not at issue here, and ALJ Kostol does not identify any differences between the VA and the SSA's evaluation or criteria for diagnosing any of

Plaintiff's numerous conditions. Further, the undersigned's comparison of the diagnostic criteria

for the VA and the SSA revealed no significant difference.[2] The VA's diagnostic criteria were in

_____

[2] A review of the Consultative Examination conducted by the VA in diagnosing fibromyalgia shows that this examination was conducted, in-person, and the following were addressed: Medication (Hydrocodone, Cyclobenzaprine, Gabapentin); Symptoms refractory to therapy, and "Findings, signs, and symptoms" as follows:


**a. Findings, signs and symptoms (check all that apply)**
[X] Widespread musculoskeletal pain
[X] Stiffness
[X] Muscle weakness
If checked, describe:
    near constant; generalized symptoms
[X] Fatigue
[X] Sleep disturbances
[X] Paresthesias
[XJ Headache
[X) Depression
[Xl Anxiety
[X) Raynaud•s-like symptoms
For all checked conditions, describe:
    all above listed symptoms are near-constant
**b. Frequency of fibromyalgia symptoms (check all that apply)**
[X] Constant or nearly constant
[X] Often precipitated by environmental or emotional stress or overexertion
If checked, describe:
    near constant; aggravated by weatheri stress; overexertion;
**c. Tender points (trigger points) for pain (check all that apply):**
[X) Low cervical region: at anterior aspect of the interspaces between transverse processes of CS-C7
[X] Occiput: at suboccipital muscle insertion
If checked, indicate side:
[ ] Right [ ] Left (X) Both
(X) Trapezius muscle: midpoint of upper border
If checked, indicate side:
( 1 Right ( 1 Left [X] Both
(X) Supraspinatus muscle: above medial border of the scapular spine
If checked, indicate side:
( ] Right [ ] Left [X] Both
[X] Lateral epicondyle: 2 cm distal to lateral epicondyle
If checked, indicate side;
[ J Right [ 1 Left [X] Both
[X] Gluteal: at upper outer quadrant of buttocks
If checked, indicate side:
[ 1 Right [ 1 Left [X] Both
[X] Greater trochanter: posterior to greater trochanteric prominence
If checked, indicate side:
[ ] Right [ J Left [X] Both
[X] Knee: medial joint line
If checked, indicate side:
[ ] Right [ J Left [X] Both
4. Other pertinent physical findings, complications, conditions, signs and/or
[X] In-person examination (R. 1276-79)

fact quite thorough. Both agencies evaluate fibromyalgia on the basis of an individual's history and frequency of pain and sufficient "tender points" testing positive under applied pressure. The VA additionally considers the medications taken, whether the symptoms have been responsive to any therapy, and takes the conditions of a veteran's service into account (such as environmental factors). It appears that the VA is actually considering *more* information and factors, then, then the SSA does, and there is no rational basis for failing to afford both VA diagnoses of

---

SSR 12-2p, on the other hand, provides:

I. *What general criteria can establish that a person has an MDI of FM?* Generally, a person can establish that he or she has an MDI of FM by providing evidence from an acceptable medical source.[3] A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence. We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam. We will review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities.

II. *What specific criteria can establish that a person has an MDI of FM?* We will find that a person has an MDI of FM if the physician diagnosed FM and provides the evidence we describe in section II.A. or section II. B., and the physician's diagnosis is not inconsistent with the other evidence in the person's case record. These sections provide two sets of criteria for diagnosing FM, which we generally base on the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia[4] (the criteria in section II.A.), or the 2010 ACR Preliminary Diagnostic Criteria[5] (the criteria in section II.B.). If we cannot find that the person has an MDI of FM but there is evidence of another MDI, we will not evaluate the impairment under this Ruling. Instead, we will evaluate it under the rules that apply for that impairment.

A. *The 1990 ACR Criteria for the Classification of Fibromyalgia.* Based on these criteria, we may find that a person has an MDI of FM if he or she has all three of the following:

1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination (see diagram below). The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.

a. The 18 tender point sites are located on each side of the body at the:

Occiput (base of the skull);

Low cervical spine (back and side of the neck); Trapezius muscle (shoulder);

Supraspinatus muscle (near the shoulder blade); Second rib (top of the rib cage near the sternum or breast bone);

Lateral epicondyle (outer aspect of the elbow);

Gluteal (top of the buttock);

Greater trochanter (below the hip); and

Inner aspect of the knee.

b. In testing the tender-point sites,[6] the physician should perform digital palpation with an approximate force of 9 pounds (approximately the amount of pressure needed to blanch the thumbnail of the examiner). The physician considers a tender point to be positive if the person experiences any pain when applying this amount of pressure to the site.

fibromyalgia in 2010 and again in 2012 and associated disability determination substantial weight.

In actuality, ALJ Kostol has simply reviewed the medical evidence and apparently determined for herself that the evidence does not support the VA's determination:

> Accordingly, the longitudinal treatment records indicate that the claimant's conditions are not totally disabling; thus, clearly demonstrating that such a deviation from affording substantial weight to the VA decision is warranted. Therefore, the undersigned has afforded only some weight to the VA decisions, which indicate the claimant is 100% disabled and unemployable as this decision is significantly out of proportion with the objective findings in the medical records.

(R. 25).

In doing so, ALJ Kostol disregarded or gave decreased weight to the opinions of numerous medical professionals, both VA and SSA agency reviewers, which will be addressed shortly. In essence, ALJ Kostol decided not to afford substantial weight to the VA decision because she determined that Plaintiff was not "totally disable[ed]," thus creating a perceived inconsistency with the VA determination. The flaws in this position and this premise are numerous. The Fourth Circuit has repeatedly admonished that an individual need not be totally bedridden in order to be unable to perform substantial gainful activity. As the undersigned elaborates in further detail below, ALJ Kostol's conclusion that the medical evidence does not support the VA determination is based on an apparent lack of understanding of Plaintiff's conditions - particularly fibromyalgia - and is not based on substantial evidence. She has thus provided no good reason for failing to afford substantial weight to the VA disability determination.

**b. ALJ Kostol erred in failing to consider the disability determination by a state agency.**

Additionally egregious is ALJ Kostol's failure to consider the fact that Plaintiff was

determined fully disabled by the State of West Virginia, independently and in addition to the VA. (R. 1148). The Fourth Circuit has held that, while not binding, "the disability determination of a state agency *is entitled to consideration* by the Secretary" (emphasis added) DeLoatche v. Heckler, 715 F.2d 148, 151, fn. 1 (4th Cir. 1983). Here, the record evidences no consideration whatsoever, and there is no explanation as to how much weight the decision of the West Virginia State Consolidated Public Retirement Board was given and why.

## 2. ALJ's failure to give appropriate weight to medical opinions

It is worth noting that in doing so, ALJ Kostol afforded little weight to agency examiner Bennett Orvik because his limitations "appear to be based upon the subjective statements of the claimant, rather than the objective medical evidence of record" (R. 34). Of course, apart from the physical examination and diagnostic criteria, ALJ Kostol does not explain what else they could possibly be based on. Fibromyalgia is one of several commonly-called invisible illnesses, because the primary symptoms are pain and fatigue, neither of which can be objectively measured or demonstrated by a particular test or study. The experience of pain is one that cannot be outwardly measured, as our precedent has long recognized and long relied on subjective statements so long as they are not contradicted. See, Hines v. Barnhart, ("Essentially, the ALJ required objective evidence that Mr. Hines' pain was so intense as to prevent him from working an eight hour day. This was in error." 453 F.3d 559, *563-64 (4th Cir. 2006). See also Craig v Chater, 76 F/3d 585, 595 (4th Cir. 1996). Here, they are not.

ALJ Kostol afforded only some weight to Susan Givens, PA-C and Jeffrey Riggs, PA-C because they, by virtue of being certified physicians assistants, are "not an acceptable medical source" (R. 34). Dr. Arnett, although an acceptable medical source, was nonetheless afforded

only some weight on the basis of speculation and conjecture as to the level of his involvement.

(R. 34). ALJ Kostol assigned great weight to the State Agency reviewers' opinions:

> Saima Noon, M.D. and Fulvio Franyutti, M.D. did not personally examine the claimant, but they had access to the longitudinal medical records on file. Lending credibility to their findings, Drs. Noon and Franyutti's opinions were in lock-step agreement.

(R. 35).

Describing this affirmation as "in lock-step agreement" is an exercise in creative writing. What ALJ Kostol fails to mention is that the reason Drs. Noon and Franyutti's opinions did not differ in the slightest is because Dr. Franyutti affirmed Dr. Noon's prior assessment without comment, by simply signing his name to it. In stark comparison was Dr. Clark, who documented her review of the underlying assessment by adding comments next to each item she affirmed, explaining why. (R.113). Ironically, it was a similar scenario that compelled ALK Kostol to afford Dr. Arnett less weight:

> Secondly, it appears that Dr. Arnett simply signed off on the statement, rather than have actually examined the claimant.

As ALJ Kostol is presumably aware, PA-Cs practice under the supervision of a medical doctor; Dr. Arnett's actively documented supervision is noted throughout 2014 in the record. Further, Dr. Arnett clearly had access to Plaintiff's longitudinal treatment records and he clearly reviewed them, responding to a request to verify Plaintiff's information for the Controlled Substance Program Manager (R. 1272). The List of Exhibits appended to ALJ Kostol's own decision (R. 7-2) further identifies the source of the RFC as "James Arnett, M.D." Nonetheless, ALJ Kostol goes on to hypothesize reasons to consider otherwise:

> Furthermore, although the signature of acceptable medical source James Arnett, M.D. was noted on a recent medical source statement, treatment records failed to establish a treatment relationship between Dr. Arnett and the claimant during the period at issue and failed to establish examinations of the claimant by Dr. Arnett during the period at issue.

Rather, Dr. Arnett was identified within the records as having done little more than acknowledge receipt of a piece of information during the period at issue (i.e., e.g., Ex. 4F/15) and affix his signature to a statement that merely noted fibromyalgia without supportive evidence and was a statement the undersigned believes reasonable to consider completed by non-acceptable medical source Mr. Riggs (i.e., Ex. L0F).

First, Dr. Arnett was the supervising doctor working with PA-C Riggs. This relationship would not entail Dr. Arnett personally conducting every moment of every interaction Plaintiff had with medical personnel at the VA Hospital. Rather, the point of a supervising physician is to oversee patients' treatment by the medical personnel working under him and ensure that it is sound. In contrast to how the ALJ characterizes Dr. Arnett's involvement, in actuality, Dr. Arnett electronically signed, along with PA-C Riggs, the treatment notes from multiple visits, ranging from January 2, 2014 (R. 1360) to November 24, 2014 (R. 323). see also R. 315, R. 1272, R. 1379. These notes show that Dr. Arnett was actively involved and aware of Plaintiff's treatment, making notes in the file that he signed contemporaneously with PA-C Riggs.

Notably absent from ALJ Kostol's conjecture is any evidence to support her apparent belief that Dr. Arnett was not physically present for the RFC, that he would have signed it without reading or considering the findings, or that as a supervising M.D., Dr. Arnett would have had any reason to be documented in the record any more than he already is. Regardless of the ALJ's personal skepticism, Dr. Arnett was working with PA-C Riggs, who indisputably was Plaintiff's primary care provider and treating physician.

Even if we were to take ALJ Kostol's unfounded speculation as to Dr. Arnett as true, the difference, of course, is twofold: 1) unlike Drs. Noon and Franyutti, Dr. Arnett did more than merely review Plaintiff's record once; and 2) Plaintiff came in person to the VA Hospital routinely for treatment with PA-C Riggs, supervised by Dr. Arnett, whereas Drs. Noon and Franyutti have never so much as laid eyes on Plaintiff. At a bare minimum, Dr. Arnett has clearly

done as much, and thus satisfied as much of the criteria for determining weight, as agency reviewers Noon and Franyutti – though it appears a near certainty he has done more and satisfied the criteria to a greater extent. As such, if the ALJ is going to consider lack of personal examination a weight-lessening factor, then the same should apply to the agency reviewers she somehow nonetheless afforded *great* weight. There is thus no consistent logic to be ascertained from the ALJ's rationales for accepting certain medical opinions here while rejecting others.

Ultimately, and most importantly, the <u>Bird</u> holding does not state that an ALJ must afford a VA disability determination substantial weight *unless* it is determined in even any small part by diagnoses made by PA-Cs, or PA-Cs working under the supervision of an M.D. Particularly in the case of veterans, who rely exclusively for the VA for their medical treatment and thus do not have as much freedom as individuals with private health insurance to choose their own healthcare providers, there are clear policy considerations as well. <u>Bird</u> holds that a VA disability determination must be given "substantial weight" in the absence of good reasons to do otherwise. Having reviewed the record and determined that the objective medical evidence is in fact largely consistent with the VA decision and the decision of the State of West Virginia, there are no good reasons for failing to afford substantial weight to the VA decision. As such, ALJ Kostol's failure to afford substantial weight to that determination is unsupported by substantial evidence.

### 3. ALJ's reasons for finding Plaintiff's subjective complaints not entirely credible are unsupported by substantial evidence.

#### 1. Fibromyalgia

ALJ Kostol questioned whether Plaintiff had fibromyalgia at all:

Upon review of the record, the undersigned has found no valid or otherwise reliable diagnosis of "fibromyalgia," as has been indicated by any qualified medical practitioner's positive findings at 11 or more of 18 recognized "tender points," i.e., the standard generally accepted by the American College of Rheumatology as serving to establish at

least a working diagnosis of that highly "subjective" syndrome. *See* SSR 12-2p. However, in order to afford the claimant the utmost benefit of the doubt, the undersigned has considered the diagnosis of fibromyalgia to be a severe impairment, which has resulted in a 40 percent disability rating through the Department of Veterans Affairs. Notably, the claimant was first diagnosed with fibromyalgia in December 2010; however, the claimant's treatment record reflect that the claimant has sought no more than conservative treatment due to this condition with prescribed pain medications. Indeed, the claimant was undergoing no treatment due to fibromyalgia. His fibromyalgia symptoms were reported to be widespread musculoskeletal pain, stiffness, muscle weakness, fatigue, sleep disturbances, paresthesias, headache, depression, anxiety and Raynaud's like symptoms that are constant or nearly constant. Physical examination found tender points in the lower cervical region, supraspinatus muscle, lateral epicondyle, gluteal, greater trochanter, and bilateral knees. Exhibit 9F. Muscle strength testing was normal in March 2014. Notably, continued treatment records indicate that the claimant sought no more than conservative medical treatment due to fibromyalgia. Thus, the undersigned finds that these symptoms are not as severe as alleged. Furthermore, the undersigned finds that the above residual functional capacity accommodates any limitations the claimant may experience due to fibromyalgia by limiting the claimant to a

range of unskilled sedentary exertional work with postural and environmental limitations, as set forth above.

Even setting aside the numerous logical flaws inherent in this rationale for the moment, this passage is nothing short of offensive – in general, and particularly with regard to ALJ Kostol's use of quotation marks when referring to "fibromyalgia." As ALJ Kostol is surely aware, as evidenced by her citation of SSR 12-2p, the Social Security Administration explicitly recognizes fibromyalgia as not only a legitimate medical condition, but one that is now "common," and fully capable of rendering an individual disabled under the Commissioner's rules.[3] Indeed, in this instance, the VA already determined that this Plaintiff's fibromyalgia was one of several disabling conditions he suffers from. ALJ Kostol advances no argument that the criteria for diagnosis differ between the VA and the SSA, and in fact, comparing the two, they

---

[3] Federal Register Vol. 77, No. 143, page 43640
**POLICY INTERPRETATION RULING**
SSR 12-2p: Titles II and XVI: Evaluation of Fibromyalgia"[Fibromyalgia] is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months. FM is a common syndrome." Available online at:
https://www.ssa.gov/OP_Home/rulings/di/01/SSR2012-02-di-01.html

appear to be largely the same. Plaintiff was diagnosed via an in-person examination, not once, but *twice*. Not a single medical opinion or practitioner in this record expressed doubt that Plaintiff did in fact have fibromyalgia. Most of them found it to be a disabling condition that was both significant and severe. The only difference is that the two agency reviewers Drs. Noon and Franyutti felt Plaintiff was less limited, in contrast to Dr. Riggs, PA-C Given, PA-C Riggs, Dr. Arnett, and Dr. Orvik who felt Plaintiff was capable of very little.

Further, after observing the VA disability rating as well as the fact that Plaintiff exhibited the associated symptoms of this illness upon physical examination, ALJ Kostol considered Plaintiff's "fibromyalgia" a severe impairment, "in order to afford [Plaintiff] the utmost benefit of the [ALJ's apparently significant] doubt." (R. 32). ALJ Kostol then proceeded to find Plaintiff less than credible – that his "symptoms are not as severe as alleged" – for apparently two reasons: because 1) treatment records indicate that [he] "sought no more than conservative medical treatment due to fibromyalgia," and 2) "muscle strength testing was normal in March 2014." Id.

These statements evidence a clear ignorance of the syndrome. First, the ALJ failed to elaborate why she considered the treatment sought by Plaintiff "conservative," and the undersigned can find no logic in this conclusion. That is, although fibromyalgia is a legitimate medical condition, the cause of fibromyalgia is yet unknown; there is no cure, nor any medically recognized pathway to either the development or resolution of the syndrome. As a result, the most physicians can offer is to treat the symptoms, which treatment typically consists of 1) pain medication to help lessen chronic widespread pain; 2) various mostly off-label prescription medications that are of limited utility;[4] and 3) for those who still retain the ability, mild exercise.

---

[4] Such as Lyrica, which the record shows Plaintiff inquired about and his treating physician advised would not be effective enough to discontinue his pain medication. (R. 1612)

ALJ Kostol identifies no surgical procedures or other similar "less conservative" measures that Plaintiff could avail himself of in order to take a more active role in managing his fibromyalgia. (Indeed, that would be difficult to do, since there are none.) Plaintiff had been taking hydrocodone for his pain for year, and Plaintiff raised the issue of alternative medications and other treatment options with his primary care provider on October 2, 2014:

> Hey Jeff Riggs, this is Charles Murphy 6723 I have a question I was wondering if the VA has Lyrica for fibromyalgia and perifial [sic] myopathy. I do not like having to take so much Hydrocodone. And the Gabepentin dont seem to be working. Just [c]hecking thank you. Charles Murphy

> lyrica will help nerve pain but i have found that you still would have to take the hydrocodone as lyrica is not as strong as hydrocodone
> /es/ JEFFREY K. RIGGS PA-C

(R. 1612), and again on March 19, 2015. (R. 1530). Further, Plaintiff's morbid obesity, widespread pain, and debilitating fatigue, among other conditions, all conspired to make exercise rather difficult and impractical in this instance. As such, Plaintiff was doing essentially all that could be expected of him under the circumstances.

Likewise, ALK Kostol cites no source, Social Security or otherwise, to support her apparent belief that normal muscle strength is relevant evidence contrary to Plaintiff's diagnosis, or sufficient to counter in any meaningful way the mountain of evidence to the contrary. Plaintiff himself reported that "if [he] lift[s] anything over 25 lbs, [he] hurt[s] for days." (R. 373). In other words, Plaintiff does not claim to be fully incapable of using his muscles at all, but rather claims that doing so is painful and difficult – which is entirely consistent with fibromyalgia syndrome. The ALJ's unexplained citation of this lone test result here is thus illogical and irrelevant, particularly in the face of an over 1600-page record replete with evidence to the contrary. As a result, the only two things the ALJ cites in support of a finding of diminished credibility do not

support that proposition. The ALJ's credibility determination is thus wholly unsupported by any evidence, let alone substantial evidence.

The larger problem this creates is that the ALJ's failure to properly grasp or account for Plaintiff's fibromyalgia and the difficulty it causes has compounded another error: failure to consider Plaintiff's impairments singly *and in combination*. For example, the ALJ also found Plaintiff less credible with regard to his back pain, because the medical evidence of record indicates "only mild degenerative findings in the lumbar spine." (R. 34). Statements like these evidence an obvious failure to consider that Plaintiff's fibromyalgia – a *chronic pain disorder* – contributes to the pain he experiences and compounds what would, under different circumstances, be a less painful condition of independent origin. In summary, ALJ Kostol's decision evidences an egregious failure to not only properly consider his fibromyalgia, but to then also consider its impact on Plaintiff in combination with his other impairments as mandated.

As to the statement that:

Upon review of the record, the undersigned has found no valid or otherwise reliable diagnosis of "fibromyalgia," as has been indicated by any qualified medical practitioner's positive findings at 11 or more of 18 recognized "tender points," i.e., the standard generally
accepted by the American College of Rheumatology as serving to establish at least a working diagnosis of that highly "subjective" syndrome. *See* SSR 12-2p.

(R. 32), some clarifications are in order. First, Plaintiff's fibromyalgia diagnosis was obtained after not just one, but two physical examinations were conducted through the VA in 2010 and again in 2012, the findings thoroughly documented in at least once instance, and those findings actually meeting the standard the ALJ cites here. (R. 662, Fibromyalgia Questionnaire). To be completely clear, the *only* matter relevant to the diagnosis that is in any valid dispute is the fact that said examinations were conducted by a certified physician's assistant (Susan Givens) at the VA, and not an M.D. or D.O., which the Commissioner argues runs afoul of SSR 06-03p.

Perhaps most telling, though, is that no medical provider in the record – acceptable or otherwise - disputes Plaintiff's fibromyalgia diagnosis or the manner in which it was made; not even the agency reviewers to whom the ALJ assigned great weight expressed doubts that Plaintiff had fibromyalgia.

### 2. ALJ Kostol's conclusion that activities of daily living contradict Plaintiff's subjective complaints is not supported by substantial evidence.

> In activities of daily living, the claimant has mild restriction. While the claimant reported some difficulties with his activities of daily living, he did reported that he takes care of his own personal hygiene, uses a riding mower, drives a car, goes shopping, and gardens. Exhibit 7E. Additionally, the claimant reported to the consultative examiner that he assists with cooking and cleaning, watches television, uses the computer and takes care of his dog. Exhibit 1 F. Accordingly, the undersigned finds that the claimant has mild restrictions in activities of daily living.

(R. 26).

Plaintiff notes that his activities have steadily decreased and he's been unable to do even the few things he used to do. The above passage represents a highly selective and disingenuous characterization of what Plaintiff has *actually* said, according to the most up to date evidence in the record: that over time he has developed problems with personal care; that he can only use the riding mower briefly and has a great deal of trouble getting started to do even that; and that extreme temperatures further make it difficult for him to be outside. His driving has become more and more limited as time has passed. His most recent reports indicate that he no longer cooks or does household chores, and his children care for his dog. To the extent that he may have been able to do these things in the past, he cannot now; to the extent that ALJ Kostol criticizes his reports as "self-reports" and not objective medical evidence, so too were the statements he made to the CE that she cited. Most problematically, ALJ Kostol's decision was issued in August of 2015; yet, she cites old reports of his daily activities and fails to mention his most recent depictions, which are significantly reduced.

Even at their height, however, Plaintiff's daily activities would not have precluded a finding of disability. Indeed, in contrast, the types of daily activities that negate credibility include significantly more demanding activities than the ones described by Plaintiff here. See Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (Riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue). See also Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination).

Plaintiff said he stopped driving, largely, primarily out of fear because he once fell asleep while driving. He also indicated that driving is additionally hazardous because of the medications he takes (hydrocodone), and also difficult because of arthritis in his right knee, leg, and hip. Plaintiff does not state that he is fully incapable of driving - an important distinction. The fact that he did on one occasion drive 20 miles to a consultative examination is not particularly probative. That is not a significantly greater distance than he is generally willing to drive, and it was one occasion – to get to a SSA-required consultative examination, in fact – not regularly. In addition, the record documents that Plaintiff has been prescribed Modafinil, which is used to treat conditions that cause sleep problems such as sleep apnea and narcolepsy. His prescription for Modafinil is objective medical evidence that Plaintiff is in fact credible as to falling asleep unexpectedly, as well as his fear going forward that he should limit his driving in case that should happen again.

### 3. ALJ Kostol's analysis of Plaintiff's subjective complaints of pain was a blatant misapplication of the law.

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[5] capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96–7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

> 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996).

The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir.

---

[5] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 17). Thus, the Court addresses only Step Two.

1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." <u>Ryan v. Astrue</u>, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

This record is full of instances in which Plaintiff reported serious pain, often rated highly. <u>See</u> <u>e.g.</u> R. 607 ("has list of concerns – worsening pain all"), 640 ("still rating pain 8/10"), 633 ("hydrocodone increased 10rng three times a day") and practically any page of the medical record. Though ALJ Kostol recognized Plaintiff's conditions as severe impairments, her reasons for discounting Plaintiff's subjective complaints, as explained fully above, cannot stand. Personal skepticism is not an appropriate basis for a credibility determination, and neither is a misunderstanding of a Plaintiff's conditions.

### 4. Prescriptions

The medications a claimant takes is evidence relevant to a credibility determination regarding allegations of pain. <u>Kearse v. Massanari</u>, 73 Fed. Appx. at *603 (taking only over-the-counter medications such as Tylenol and Motrin for pain supported finding that pain was not as severe as claimant alleged). Taking only mild pain relievers, in absence of objective medical evidence to support allegations of pain, and in conjunction with daily activities that contradict those allegations, does not support a finding of disability. <u>Shively v. Heckler</u>, 739 F.2d 987, 989-90 (4th Cir. 1984) (Extra strength Tylenol and extra strength Excedrin, and a prescription analgesic intended for mild to moderate pain, did not sustain pain allegations alone without supporting objective medical evidence).

Here, it is well-documented throughout the record that Claimant was prescribed Hydrocodone for years, which he continues to take. Hydrocodone is a prescription-strength Schedule II controlled substance and opioid pain medication designed to treat *severe pain*.[6] Thus, the medications Plaintiff has been prescribed wholly supports Plaintiff's allegations of pain.

The full list of Plaintiff's medications as of July 6, 2015 is extensive and shows he is still taking hydrocodone (R. 1625).

### 5. Activities of daily living

In addition to Plaintiff's occasional "gardening," ALJ Kostol characterized Plaintiff's activities of daily living generously as follows:

> While the claimant reported that he had no energy, he also reported that he "can help around the house a little bit. He reported that he attends some of his daughter's softball games" and that he spends time with his family when they are around and spends time with his dog. He further reported that he watches crime shows, westerns, and football. Exhibit 9F.

None of these activities are strenuous or require significant energy. It is therefore patently illogical how ALK Kostol proposes that Plaintiff's very limited activities of daily living contradict his subjective statements, nor does she provide explanation. Plaintiff did discuss gardening with Dr. Shibley. (R. 635). The irony, of course, is that "gardening" was identified in an individual therapy session with Dr. Shibley on November 30, 2012 as a stress management skill, along with spending time with his dog and breathing exercises (R. 575) – activities that he was *encouraged to engage in as part of his mental health treatment* because they relieved stress and were coping skills (R. 635).

---

[6] Zohydro ER (hydrocodone bitartrate) – Drug Summary. Retrieved October 25, 2016 from Physicians' Desk Reference Online (PDR.net): http://www.pdr.net/drug-summary/Zohydro-ER-hydrocodone-bitartrate-3389.4565

Further, Plaintiff clarified specifically that his "gardening" was a fairly generous term, since it was limited to plants in flower pots on his back porch. In other words, Plaintiff is not engaged in shoveling, rototilling, or other strenuous activities associated with traditional gardening. He sits on a riding mower once a week for a short period of time, and reports significant difficulty doing even that given energy, fatigue, and intolerance to heat. He walks daily, but it is to his mailbox. A *fair* reading of Plaintiff's daily activities and his subjective complaints unearths no inconsistency.

## 1. Noncompliance

Lastly, allegations of noncompliance are likewise unsupported, and certainly not to the extent any deviations are characterized in ALJ Kostol's decision. The record indicates that Plaintiff could not use a CPAP machine because of PTSD-associated phobia of having a mask on his face, a diagnosis that is also well documented in the record. The ALJ's characterization of this difficulty as mere noncompliance is disingenuous. Further, the record also indicates that he was apparently able to begin using a BiPAP machine in the alternative.

ALJ Kostol also paints Plaintiff as perpetually noncompliant with his insulin. Yet, although there was at least one documented instance in the medical record where Plaintiff appears to have either misunderstood or simply misjudged when he could take insulin for low blood sugar versus eating food, etc., the record also indicates that VA personnel went over this information with Plaintiff to educate him as to how to best manage his blood sugar. There are also documented instances in the record where his diabetes was noted as uncontrolled and his dosage had to be adjusted.

Lastly, ALJ Kostol seizes on Psychologist Damm's observation that Plaintiff has not been in therapy lately or that he declined one on one counseling at one point. On the other hand,

the record is full of instances where Plaintiff *actually attended* one on one counseling sessions, especially for anger management and stress control, spanning years, and with different psychological providers with the VA. Given his difficulties and the distance from his home to the VA center, it is rather remarkable that he was doing that much.

### D. Remedy

Ordinarily, an ALJ's failure to meet her obligation and duty under the law would result in remand with instructions to do so. See Braxton v. Colvin, 2015 WL 1097333, 1:12CV1232, M.D. N.C. 2015). However, "whether to remand for further consideration or for an award of benefits is within the sound discretion" of the court. Id. at *6. An award of benefits is more appropriate when 1) the Commissioner has had an opportunity to develop the record on the issue in question and has failed to do so, or 2) there is substantial evidence establishing a Plaintiff's disability and remand would only further delay receipt of benefits while serving no useful purpose. Id. Such circumstances are clearly present here.

ALJ Kostol's refusal to give appropriate weight to the VA disability rating in absence of good reasons, her failure to consider the disability determination by the State of West Virginia, and her credibility findings and treating source determination being unsupported by substantial evidence in the face of overwhelming evidence to the contrary would render any remand for reconsideration futile and serve only to delay Plaintiff's benefits unnecessarily. Further, the Appeals Council directed ALJ Kostol to clarify the status of Plaintiff's fibromyalgia; and the record contains documentation in Plaintiff's file specifically advising that the VA would be happy to provide any information the SSA needed to assist in Plaintiff's disability determination. (R. 278).Yet, ALJ Kostol did not obtain more information, as she was always able to do; she did not in the alternative ask Plaintiff to obtain and provide more information, nor did she take

advantage of the VA's offer to provide such information. As not just one but two ALJs have made egregiously erroneous decisions to date and evidenced shameful treatment of a service-connected disabled veteran, there is no faith that a third attempt would be of any use.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 11) be **DENIED**, and this case be **REMANDED** for the calculation and award of benefits, because remand for any other purpose would certainly constitute an entirely unnecessary delay, and would serve no meaningful purpose.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for

Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this February 1, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE